1  Robert E. Connolly (320382)
   bob@reconnollylaw.com
2  Law Office of Robert E. Connolly
   301 N. Palm Canyon Drive
3  Suite 103; #241
   Palm Springs, California 92262
4  (215) 219-4418
   Counsel for Relator Eugene Sellers

**FILED**

DEC 19 2018

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

5

6

7              **UNITED STATES DISTRICT COURT**

8         **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

9

10  **United States of America ex rel.**            Civ. Case No:

11  **Eugene Sellers,**
                                                18 CV 2849 W MSB
12                                              **Relator's Complaint For**
    **v.**                                      **Damages and Penalties**
13                                              **Under the False Claims Act**
                                                **31 U.S.C. §§ 3729-3732**
14  **Hawaiian Native Corp.; Dawson**
    **Technical, LLC;**
15  **Dawson Federal Inc.,**                    **FILED UNDER SEAL**
    **Dawson Solutions, LLC;**                  **31 U.S.C. §3130(b)(2)**
16  **Dawson Enterprises, LLC;**
17  **Dawson Global, LLC;**
    **D7, LLC;**
18  **Wagon Wheel, LLC;**
19  **BD Solutions, LLC;**
    **Total Reliant Solutions, LLC;**
20  **Program Construction and Management, LLC;**
21  **and Sandlot Ventures, LLC**              **Jury Trial Demanded**

22

23           **Relator Eugene R. Sellers' Qui Tam Complaint**
24           **Pursuant to the Federal False Claims Act**

25

26

27

28

Relator Eugene Sellers, ("Relator"), brings this action against Defendants under the False Claims Act, 31 U.S.C. § 3729, et seq. ("FCA"), on behalf of the United States and on his own behalf to recover all damages, penalties, and other remedies for violations of the FCA and alleges as follows:

## I.   INTRODUCTION

1.    This is an action to recover damages and civil penalties on behalf of the United States arising from false and/or fraudulent records, statements and claims, used and caused to be made, used or presented by the Defendants, and/or their agents and employees in violation of the FCA, 31 U.S.C. § 3729, et seq.

2.    In accordance with 31 U.S.C. § 3730(b)(2), this Complaint is filed in camera and will not be served on the Defendants until the Court so orders.  A copy of the Complaint and written disclosure of substantially all material evidence and information the Relator possesses have been served on the United States pursuant to 31 U.S.C. Section 3730(b)(2) and Federal Rule of Civil Procedure 4(i).

## II.   JURISDICTION AND VENUE

3.    This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, and 1367(a) and 31 U.S.C. § § 3732 and 3729.

4.    There has been no statutorily relevant public disclosure of the allegations and transactions in the Complaint.  Relator qualifies under the FCA as a "original source" of the allegations in this Complaint.

5.    This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C.

§ 3732(a), which authorizes nationwide service of process in cases brought under the FCA, and because, Defendant Hawaiian National Corporation (HNC) has subsidiary offices in this District, Defendants have transacted business in this District, have engaged in wrongdoing in this District, and have at least minimum contacts with the District.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a) because the Defendants can be found in this District, transacts business here, and acts proscribed by 31 U.S.C. § 3729 occurred here.

### III.    OVERVIEW -- NATIVE HAWAIIAN ORGANIZATIONS

7.      In recognition of the social and economic hardships that have long plagued Native Americans, Congress in 1986 enacted legislation that allowed numerous Native American groups to participate in the Small Business Administration 8(a) Business Development Program ("8(a) Program").  The 8(a) Program was created to provide socially and economically disadvantaged small businesses the "maximum practical opportunities" to participate in the marketplace of government contracting.  Eligibility for the program requires an applicant to be a "small business concern" and is good for no longer than nine years. See, 13 CFR 124.110.

8.      The 8(a) Program provides support to small, disadvantaged businesses, particularly with gaining access to the Federal marketplace.  Small businesses owned by Native entities, such as Native Hawaiian Organizations (NHOs), Tribes, and Alaska Native Corporations (ANCs), are authorized to participate in the 8(a) Program

under special rules. While the rules differ depending on the Native entity, the ultimate intent of the Native 8(a) Program is to provide Native communities with the ability to develop self-sufficient economic ventures that support their Native communities. Unlike businesses owned by individuals, profits generated from a Native-owned 8(a) participant go back to their Native communities rather than individual business owners.

9.     Pursuant to SBA regulations, NHOs are non-profit organizations, managed by Native Hawaiians, that principally serve Native Hawaiians. Since the term NHO applies in the context of the 8(a) Program, NHOs must also have a majority ownership of a for-profit, small business that has been approved to participate in the 8(a) Program.

10.     NHOs can receive sole-source contracts above the 8(a) ceiling for Department of Defense contracts.

11.     The Defendants engaged in a conspiracy to violate the FCA and defraud the NHO Program.

IV.          **PARTIES**

12.     Relator, **Eugene R. Sellers**, is a resident of Stafford, Virginia. Relator Sellers was employed by Dawson Federal, Incorporated and Dawson Solutions from November 18, 2014 until September 10, 2018, when he resigned. Sellers was a senior manager with program management of the National Security Program and Business Development representing all Dawson Group Defendant companies.

13.     Relator Sellers is also a retired Special Agent of the Air Force Office of Special Investigations ("AFOSI").    Sellers was an AFOSI agent from 1989 until his retirement in 2004. Relator had specific training and experience in detecting crimes of fraud on Department of Defense contracts.

14.     The **Hawaiian Native Corporation** ("HNC") is made a defendant herein. Its address is 900 Fort Street Mall, Suite 1850, Honolulu, HI 96813, Commercial and Government Entity (CAGE) Code: 596P3.  The HNC is a non-profit organization founded in February 2004. HNC is recognized by the Department of Defense under federal statutory authority as a "Native Hawaiian Organization" ("NHO") and is a Certified NHO 8(a) by the U.S. Small Business Administration (SBA). Its subsidiary companies are certified as Small Disadvantaged Businesses (SDB) and Native Hawaiian Organization 8(a).

15.     HNC subsidiary companies are certified as Small Disadvantaged Businesses (SDB) and Native Hawaiian Organization (NHO) under the 8(a) Program. Current subsidiary companies of the HNC include the following:

Dawson Technical, LLC – graduated from the SBA 8(a) program.

Dawson Federal, Inc – Native 8(a) SDB

Dawson Solutions, LLC – Native 8(a) SDB

Dawson Enterprises, LLC – Native 8(a) SDB

Dawson Global, LLC – Small Business

D7, LLC – Native 8(a) SDB

16.     Defendants Hawaiian Native Corporation and six of its wholly owned subsidiaries are collectively known in the Complaint as the Dawson Group Defendants.  They all have a common address of 900 Fort Street Mall Suite 1850, Honolulu, Hawaii, though each subsidiary also has its own offices including Dawson Federal, Inc.'s office located in this District at 3111 Camino Del Rio N Ste 400, San Diego, CA 92108-5724.

17.     **Dawson Federal Incorporated** is made a defendant herein.  Dawson Federal is a wholly owned subsidiary of HNC. Dawson Federal was Small Business 8(a) certified on August 3, 2011.  Its addresses are 3111 Camino Del Rio N Ste 400, San Diego, CA 92108-5724 and 112 East Pecan Street, Suite 300, San Antonio, TX 78205, CAGE Code: 6UTH1; 900 Fort St Mall Ste 1850, Honolulu, HI, 96813-3707 CAGE Code:  5U1X2; 1755 Testar Drive, Suite 500, Colorado Springs, CO 80920-1021, CAGE Code:  728H3; 822 N. A1a Hwy, Ste 310, #326, Ponte Vedra, FL, 32082-8209, CAGE Code: 791A3; and 200 Spectrum Center Suite 1220, Irvine, CA 92618-5007, CAGE Code: 7WV46.   Dawson Federal specializes in Information Technology (IT) / Cyber, Logistics, Construction and Facilities Management Services for the Department of Defense, General Services Administration and other federal agencies. Dawson Federal has a TOP SECRET Facility Clearance (FCL).

18.     **Dawson Solutions, LLC** is made a defendant herein. Dawson Solutions is a wholly owned subsidiary of HNC. Dawson Solutions was SBA 8(a) certified on October 14, 2018. Its addresses are 310 Voyager Way, Suite 109, Huntsville, AL 35806, CAGE Code: 57JH5; 661 Dunbar Cave Rd #102, Clarksville, TN 37043

CAGE Code: 7S4Y5; and 200 Spectrum Center Drive Ste 1220, Irvine, CA 92618, CAGE Code: 83B80. Dawson Solutions, LLC provides Environmental, Military Munitions Removal and Facilities Management Service needs. Dawson Solutions has a TOP SECRET FCL.

19. **Dawson Global, LLC** is made a defendant herein. Dawson Global is a wholly owned subsidiary of HNC. Its addresses are 288 South Marine Corp Drive P2013, Tamuning, Guam, CAGE Code: 7E5U5 and 900 Fort St Mall Ste 1850, Honolulu, HI, 96813-3721 CAGE Code: 75ET1.

20. **Dawson Technical, LLC** is made a defendant herein. Dawson Technical was SBA 8(a) certified on October 10, 2007. Its addresses are 4010 W. Newberry Rd. Ste B, Gainesville, FL 32607, CAGE Code: 6VX12; 310 Voyager Way Ste 105, Huntsville, AL, 35806-3200, CAGE Code: 6LRU0; 900 Fort Street Mall Ste 1850, Honolulu, HI, 96813-3721, CAGE Code: 37SH3; 101D Katelyn Circle, Warner Robins, GA, 31088-6484, CAGE Code: 6YQA5; 1 Meadowlands Plaza #200, East Rutherford, NJ, 07073-2152, CAGE Code: 7EAX4;  112 E Pecan St Ste 300, San Antonio, TX, 78205-1539, CAGE Code: 5EN14; 1100 Wilson Blvd 10th Floor Room 1003, Arlington, VA, 22209-2249, CAGE Code: 6UK04; and  1755 Telstar Drive Suite 500, Colorado Springs, CO 80920, CAGE Code: 6W2Z8.  Dawson Technical has a TOP SECRET FCL.

21. **Dawson Enterprises, LLC** is made a defendant herein. Its address is 900 Fort St Mall Ste 1850, Honolulu, HI, 96813, CAGE Code: 76NW2.  Dawson Enterprises LLC was SBA 8(a) certified on November 1, 2015. The company's line

of business includes providing management consulting services. Dawson Enterprises has a TOP SECRET FCL.

22.   **D7, LLC** is made a defendant herein. Its addresses are 1755 Telstar Dr Ste 500 Colorado Springs, CO, 80920-102, CAGE Code:  7KG16; and 900 Fort Street Mall Ste 1850 Honolulu, HI, 96813-3707, CAGE Code:  7KK47.   D7 was SBA 8(a) certified on February 2, 2018. The company's business includes information technology support. D7 has a TOP SECRET FCL.

23.   **Wagon Wheel NS, LLC** is made a Defendant herein. Its address is 900 Fort Street Mall, Suite 1850, Honolulu, HI 96813. It is a Hawaiian Domestic Limited Liability Company started on July 19, 2013 and its principal officer is Bryan Hara, a Dawson Group Defendant employee and officer of the HNC. Mr. Hara is not a native Hawaiian.

24.   **BD Solutions, LLC** is made a Defendant herein. It is a Texas Limited Liability Corporation started in 2012 and its address is 106 Quail Court, Boerne, TX 78006. Its principal officers are Dwayne Sellers and Bobby Miller, both Dawson Group Defendant employees. Mr. Sellers and Mr. Miller are not native Hawaiians.

25.   **Total Reliant Consulting, LLC**, is made a defendant herein. It is a Texas Limited Liability Company formed on October 28, 2014. Its address is 106 Quail Ct Boerne, TX, 78006-8933, CAGE:  7ACK7. Its principal officers are Frank P. Gilbert, Ronald H. Dryburgh and Dwayne Sellers, a Dawson Group Defendant employee. Mr. Sellers is not a native Hawaiian.

26.     **Program and Construction Management, LLC** is made a defendant herein. It is a Texas Limited Liability Company. Its address is 3501 Horace Ave Keller, TX 76244. Its principal officers are Bobby Miller and Elodia Miller, both Dawson Group Defendant employees. The Millers are not native Hawaiians.

27.     **Sandlot Ventures, LLC** is made a defendant herein. It is a Florida Limited Liability Company. Its address is 3702 SW 92nd Dr., Gainesville, FL 32608. Its principal officers are Jeffrey Bleke, Wes Lane, and Billy Cress, all Dawson Group Defendant employees. Mr. Bleke, Lane and Cress are not native Hawaiians. Mr. Cress is an officer of the HNC.

28.     The Dawson Group Defendants provide a variety of services to government and commercial entities including: construction, facility renovation and construction, design-build of facilities and infrastructure, building decontamination and demolition, electrical infrastructure upgrades, construction and program management, environmental services and remediation, emergency response services to time critical situations, logistics services, administrative and technical support services, airfield and aircraft maintenance, grounds and custodial maintenance, logistics management, facilities operations and maintenance, information technology, intelligence, classified logistics, engineering, and cybersecurity.

29.     Dawson Group Defendants officers and employees own a series of companies which they utilize to submit invoices as vendors or subcontractors of the Dawson Group Defendants to circumvent the SBA 8(a) Program regulations, Federal

Acquisition Regulations (FAR), and Defense Federal Acquisition Regulations (DFAR) and other laws and regulations.

## V.        GENERAL ALLEGATIONS

30.     The Defendants conspired to violate the FCA and violated the FCA by making, using and presenting materially false and fraudulent certifications to the United States:

a.  To acquire certification as SBA 8(a) small and disadvantaged business and NHO;

b.  To acquire CAGE Codes from the Government Services Administration (GSA) for use in bidding on federal contracts;

c.  To be awarded classified contracts and be given access to International Traffic in Arms Regulations (ITAR) and Export Administration Regulations (EAR) controlled information; and

d.  To be awarded contracts by the United States.

31.     The Defendants conspired to violate the FCA and violated the FCA by making, using and presenting materially false and fraudulent records and claims to the United States for payment.

32.     Officers and employees of the Dawson Group Defendants own companies that invoice the Dawson Group Defendants for work performed as vendors or subcontractors to circumvent the SBA 8(a) Program regulations, Federal Acquisition Regulations (FAR), and Defense Federal Acquisition Regulations (DFAR).

33.     Dawson Group Defendants have engaged in cost and labor mischarging and time card fraud by improperly charging time and material expenses to the United States under various contracts to circumvent the FAR, DFAR and SBA 8(a) regulations.

34.     Dawson Group Defendants have transferred money and assets to companies owned by Dawson Group Defendant's officers and employees and paid them for "phantom" services that were not performed.

35.     These false statements by the Defendants were material in that, had the government known the truth, the contracts would not have been awarded, nor payment made on these contracts.  The companies would not have qualified as native 8(a) if they provided truthful disclosure to the SBA. Defendants deliberately made false certifications and representations to game the SBA system to take advantage of the benefits of the SBA bidding, while undermining the purpose of the SBA set aside program.   In doing so, they denied other NHO's and SBA SDB's who were playing by the rules from being awarded contracts they rightly should have had the chance to bid on.

## VI.     Applicable Laws

### A.     The False Claims Act

36.     The False Claims Act makes subject to legal action any person who knowingly presents or causes to be presented false or fraudulent claims for payment or approval to the United States. 31 U.S.C. § 3729(a)(l). The FCA also makes subject to suit any person who "knowingly makes, uses, or causes to be made or used a false

record or statement material to a false or fraudulent claim." 31 U.S.C. §

3729(a)(l)(B).

37.     The term "knowingly" under the FCA means that a person, with respect to information, (a) has actual knowledge of the information, (b) acts in deliberate ignorance of the truth or falsity of the information, or (c) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3728(b)(l). No proof of specific intent to defraud is required to show a person acted knowingly under the FCA. 31 U.S.C. § 3729(6).

38.     The FCA provides for recovery of three times the damages sustained by the United States ("treble damages") plus a civil penalty for each false claim presented or caused to be presented. This penalty is to be not less than $5,500 and not more than $11,000, per instance. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3(a)(9).

### B.     The Small Business Act

39.     Congress established the Small Business Administration ("SBA") in 1953. The SBA is a cabinet-level agency headquartered in Washington, D.C. Its mission is to preserve free competitive enterprise and to maintain and strengthen the overall economy  of our nation by assisting in and facilitating the creation and growth of small businesses, a critical component of the country's economic strength and health.

40.     As set forth in Section 2 of the Small Business Act: The essence of the American economic system of private enterprise is free competition. Only through full and free competition can free markets, free entry into business, and opportunities

for the expression and growth of personal initiative and individual judgment be assured. The preservation and expansion of such competition is basic not only to the economic well-being but to the security of this Nation. Such security and well-being cannot be realized unless the actual and potential capacity of small business is encouraged and developed. It is the declared policy of the Congress that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small business concerns in order to preserve free competitive enterprise, to ensure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government (including but not limited to contracts or subcontracts for maintenance, repair, and construction) be placed with small business enterprises, to ensure that a fair proportion of the total sales of Government property be made to such enterprises, and to maintain and strengthen the overall economy of the Nation. 15 U.S.C. § 63.

41. Without the 8(a) Program, it would be difficult for a startup company to win contracts competing against larger, more established companies. However, if a company is granted 8(a) status, there are numerous rules and regulations the company must follow.

42. The Federal Acquisition Regulations ("FAR") further state that "[i]t is the policy of the United States that small business concerns ... shall have the maximum practicable opportunity to participate in performing contracts let by any Federal agency." FAR 52.219-8 ("Utilization of Small Business Concerns")

43.     The SBA is responsible for developing and administering initiatives to encourage the selection of small businesses to perform government contracts. These efforts include various programs setting aside certain government contracts exclusively for small business concerns.

44.     In the Small Business Act, Congress created a government-wide goal for contracting to small businesses. 15 U.S.C. § 644(g). Each year, the SBA reports on each of the federal agencies' progress in reaching its goal. In order to meet the small business contracting goals, each federal agency involved in procurement creates opportunities called "set- asides" for either all small businesses or a subset of small businesses to compete against a pool of like-size contractors. This allows small businesses to gain opportunities they might not have had competing against larger, resource-rich companies.

45.     For the purposes of federal procurement programs for which status as a small business concern is required, a concern must not exceed the size standard established by the SBA for the type of services at issue. The size standard is articulated in terms of either the maximum allowable average number of employees in a 12-month period or the maximum allowable average annual receipts over a three-year period. The specific standard varies based upon the particular industry at issue. Each size standard is matched to an industry code described in the North American Industry Classification System ("NAICS"), and the table is published annually in the Federal Register. 13 C.F.R. § 121.101.

46.     For example, NAICS Code 541519 for "Other Related Computer Services" has a size standard of average annual revenues of $25.5 million or less or, in the case of "Information Technology Value Added Resellers," 150 employees or less. 13 C.F.R. § 121.201. Businesses may have a primary NAICS code, but may also qualify for other NAICS codes depending on their business activities.

47.     To qualify for small business status, a company may not be affiliated with any other entities which, when combining the assets, employees, or other size factors of the affiliated company or companies with the business, would cause the business to exceed the size standards.

48.     The SBA determines whether an entity qualifies as a small business concern by counting its receipts, employees, or other measure including those of all its domestic and foreign affiliates, regardless of whether the affiliates are organized for profit. 13 C.F.R. § 121.103(a)(6).

49.     "Affiliation" exists when one business controls or has the power to control another or when a third party (or parties) controls or has the power to control both businesses. 13 C.F.R. § 121.103(a)(l). Control may arise through "ownership, management, previous relationships with or ties to another concern, and contractual relationships." 13 C.F.R. § 121.103(a)(2). If one or more officers, directors, managing members, or general partners of a business controls the Board of Directors and/or the management of another business the businesses are affiliates. 13 C.F.R. § 121.103(e).

50.     "Affiliation" also exists when there is an identity of interest between individuals or businesses, including family members. Individuals or firms that have

identical (or substantially identical) business or economic interests may be treated as though they are affiliated unless they can demonstrate otherwise. Family members, persons with common investments, or firms that are economically dependent through contractual (or other) relationships, are among those treated this way. Patterns of subcontracting, commingling of staff and/or facilities, and other veiled attempts to disguise the true nature of the relationship may evidence an identity of interest. 13 C.F.R. § 121.103(t).

51.    Additionally, "Affiliation" exists under the "Newly Organized Concern Affiliation may exist where former officers, directors, principal stockholders, managing members, or key employees of one concern organize a new concern in the same or related industry or field of operation, and serve as the new concern's officers, directors, principal stockholders, managing members, or key employees, and the one concern is furnishing or will furnish the new concern with contracts, financial or technical assistance, indemnification on bid or performance bonds, and/or other facilities, whether for a fee or otherwise ... A "key employee" is an employee who, because of his/her position in the concern, has a critical influence in or substantive control over the operations or management of the concern. 13 C.F.R. § 121.103(g).

52.    Eligibility for small business opportunities is generally determined on a procurement-by-procurement basis. Each procurement officer must classify the product or service being sought in a particular NAICS code, identify the size standard that the SBA has set for that code and specify the standard in the solicitation, so businesses can correctly determine if they qualify as small for that particular

solicitation. FAR 19.102.  A business may generally qualify as small under their primary NAICS code, but may not qualify as small for a particular procurement and vice-versa.

53.     Businesses that do not qualify as a small business concern are labeled as "other than small." Being "other than small" is not the same as being large; it only means that the company does not qualify under the parameters set by Congress and the SBA to be classified as a small business concern for a procurement only available to small businesses.

54.     The SBA relies on businesses to self-certify their qualification as a small business as a condition of bidding on government contracts. Effective July 30, 2012, registration has been required through the System for Award Management ("SAM"). Prior to that time, contractors were required to register with the Central Contractor Registration ("CCR").

55.     In registering or renewing its registration (which must be done at least annually), a business provides general information and, among other things, certifies and represents whether it is a small business.

56.     It is a federal criminal offense to "misrepresent[] the status of any concern or person as a 'small business concern' ... in order to obtain for oneself or another any" prime contract or subcontract. 15 U.S.C. § 645.

57.     When a company bids on set-aside government contracts by misrepresenting its organizational status or affiliations with larger, non-qualified

businesses, it takes contracts away from legitimate small businesses and undermines the objectives of the SBA.

58.    The Small Business Act provides that any business that misrepresents its status as a small business concern shall be subject to penalties under the False Claims Act. 15 U.S.C. § 637(m)(5)(C).

59.    Pursuant to 15 U.S.C. § 632(w)(l), there is a "presumption of loss to the United States based on the total amount expended on the contract ... whenever it is established that a business concern other than a small business concern willfully sought and received the award by misrepresentation."

60.    Further, 15 U.S.C. § 632(w)(2) states that: The following actions shall be deemed affirmative, willful, and intentional certifications of small business size and status:

> (A) Submission of a bid or proposal for a Federal grant, contract, [or] subcontract ... reserved, set aside, or otherwise classified as intended for award to small business concerns.
> (B) Submission of a bid or proposal for a Federal grant, contract, [or] subcontract ... which in any way encourages a Federal agency to classify the bid or proposal, if awarded, as an award to a small business concern.
> (C) Registration on any Federal electronic database for the purpose of being considered for award of a Federal grant, contract, [or] subcontract ....

## C.    Native Hawaiian Organizations

61.    NHO's have specifics regulations under the 8(a) Program. 13 CFR §124.110 et seq. NHO's as defined in § 124.3, are eligible for participation in the 8(a) program and other federal programs requiring SBA to determine social and economic disadvantage as a condition of eligibility. Such concerns must meet all eligibility

criteria set forth in §§ 124.101 through 124.108 and § 124.112 to the extent that they are not inconsistent with this section.

62.    A concern owned by a Native Hawaiian Organization must qualify as a small business concern. The size standard corresponding to the primary industry classification of the applicant concern applies for determining size. SBA will determine the concern's size independently, without regard to its affiliation with the Native Hawaiian Organization or any other business enterprise owned by the Native Hawaiian Organization, unless the Administrator determines that one or more such concerns owned by the Native Hawaiian Organization have obtained, or are likely to obtain, a substantial unfair competitive advantage within an industry category. In determining whether an NHO-owned concern has obtained, or is likely to obtain, a substantial unfair competitive advantage within an industry category, SBA will examine the firm's participation in the relevant six-digit NAICS code nationally.

63.    SBA will consider the firm's percentage share of the national market and other relevant factors to determine whether the firm is dominant in a specific six-digit NAICS code with a particular size standard.

64.    SBA does not contemplate a finding of affiliation where an NHO-owned concern appears to have obtained an unfair competitive advantage in a local market, but remains competitive, but not dominant, on a national basis.

65.    An NHO must establish that it is economically disadvantaged and that its business activities will principally benefit Native Hawaiians. In order to establish that an NHO is economically disadvantaged, it must demonstrate that it will principally

benefit economically disadvantaged Native Hawaiians. To do this, the NHO must provide data showing the economic condition of the Native Hawaiian community that it intends to serve.

66.    An NHO should describe any activities that it has done to benefit Native Hawaiians at the time its NHO-owned firm applies to the 8(a) BD program. In addition, the NHO must include statements in its bylaws or operating agreements identifying the benefits Native Hawaiians will receive from the NHO. The NHO must have a detailed plan that shows how revenue earned by the NHO will principally benefit Native Hawaiians. As part of an annual review conducted for an NHO-owned Participant, SBA will review how the NHO is fulfilling its obligation to principally benefit Native Hawaiians.

67.    An NHO must control the applicant or Participant firm. To establish that it is controlled by an NHO, an applicant or Participant must demonstrate that the NHO controls its board of directors, managing members, managers or managing partners.

## VI.    Specific Allegations

### A. FALSE CERTIFICATIONS

i.    **The Dawson Group Defendants Conspired to violate the FCA and repeatedly violated the FCA By Making, Using and Presenting Materially False Claims and Records to the United States to Acquire Certification as SBA 8(a) Small and Disadvantaged Businesses and a Native Hawaiian Organization**

68.     The SBA provides opportunities to companies that have been qualified as an 8(a) disadvantaged business. The Dawson Group Defendants abused and unlawfully used these laws to maintain 8(a) status and be awarded 8(a) contracts as a small and disadvantaged business and NHO.

69.     SBA rules constrain the management of NHOs.  A native can manage all the companies s/he wants.  A non-native manager cannot manage more than two (2) 8(a) NHO business concerns. Yet, Billy Cress, a non-native, was always the manager of the Dawson Group Defendant companies. Brian Hara is the Chief Financial Officer across all Dawson Group Defendant companies.  Both are non-Hawaiian natives and thus should be limited to two (2) positions.  The business structure and management are a part of the SBA representations and certifications (aka: Reps & Certs) process ensuring the company doesn't have a non-native manager controlling more than one company.

70.     Dawna Smith the Secretary and officer of the Hawaii Native Corporation Board of Directors and knowingly provided the false and misleading representations and certifications regarding native management and control to the SBA and to GSA for the Dawson Group Defendants and other defendant companies. Ms. Smith was also the Director, Human Resources for each company.

71.     The Dawson Group Defendants, their officers and employees abused their SBA 8(a) status and conspired to circumvent the rules established for SBA 8(a) qualified entities and filed false, material statements with the United States.

72.     The Dawson Group Defendants have been awarded millions of dollars of contracts with the Department of Defense and other federal agencies. In its submission of bids for these contracts the Dawson Group Defendants falsely represented that each particular subsidiary qualifies as a SBA 8(a) business.  They also falsely certified to the government that the particular SBA 8(a) business entity will perform the contract and is in compliance with laws requiring it to perform at least 51% of the work. Each submission contained a "Program Management" section describing the organization structure with Billy Cress, a non-Native Hawaiian, as the President of each company, Dawna Smith, a non-Native Hawaiian, as the Director of Human Resources, and other Dawson Group Defendant managers who were also non-Native Hawaiians holding the same key personnel roles in each of the companies. Essentially, they kept the same organizational chart changing only the name of the company.

73.     Once awarded these government contracts, the Dawson Group Defendants presented claims for payment to the United States based on the same representations and certifications regarding the SBA SDB entity that performed the work.

74.     Certain employees of the Dawson Group Defendants resigned from their positions when compelled by their employer to make false statements and representations to the United States.

75.     Officers and employees of the Dawson Group Defendants are compensating themselves through multiple SBA 8(a) contracts simultaneously by

taking "excessive withdrawals" in violation of 13 CFR 124.112(d) and misrepresenting this information in certifications to the United States.

76.    A withdrawal from the company can include owner's salaries and retirement contributions, rent paid to affiliated companies, distributions in excess of the amount required to pay taxes generated by the business, and loans to related parties.  These withdrawals also include payments to family members not employed by the company.  To avoid violating the excessive withdrawal rules, a company with annual sales of $1 million or less must limit withdrawals to $250,000 annually, companies with sales between $1 million and $2 million must limit withdrawals to $300,000, and if company sales exceed $2 million, the annual limit for withdrawals is $400,000.  As the ultimate goal of the program is to help business owners strengthen their company to be able to survive in the full and open competition after graduation, the SBA strictly enforces these limitations and excessive withdrawal rules, which causes participants to keep their earnings in the company until graduation.

77.    An example of Defendant Dawson Group's efforts to circumvent the excessive withdrawals regulations involved a contract awarded on by the Air Force to Dawson Enterprises in December of 2016. Specifically, a $21,357,584 contract, FA2823-17-C-4010, for construction of modular buildings at Eglin Air Force Base, Florida, to be complete by August 31, 2017. This award was the result of a sole-source acquisition which was received based on the Dawson Group Defendants certification in the 8(a) Program.

78.     Bobby and Elodia Miller are the principal officers for Defendant Program and Construction Management, LLC and Dawson Group Defendant employees. Neither are native Hawaiians. Program and Construction Management principle owners are Jeff Bleke, Wes Lane and Billy Cress who are all Dawson Group Defendants employees and are not native Hawaiian.

Billy Cress is the President of the Dawson Group Defendants and is not a native Hawaiian

79.     After the award of the Air Force contract FA2823-17-C-4010, Billy Cress directed Elodia Miller to cause Program and Construction Management to invoice Dawson Enterprises $100,000 for undisclosed work.  She complied. In January 2017, Program and Construction Management was paid $100,000. Billy Cress then directed Elodia Miller to provide him a check from Defendant Program and Construction Management written to Billy Cress for $100,000.

80.     This allowed Billy Cress to receive excessive compensation in violation of SBA and NHO Program regulations without it being reflected in possible audits of the Dawson Group Defendants.

ii.     **The Dawson Group Defendants Conspired to violate the FCA and repeatedly violated the FCA By Making, Using and Presenting Materially False Claims and Records to the United States to acquire CAGE Codes from the GSA for use in bidding on federal contracts**

81.     The Government Services Administration, through the System for Award Management, issues Commercial and Government Entity Codes (CAGE) to federal contractors. A CAGE Code is required to be awarded a federal government

- 24 -

contract. To be issued a CAGE Code, contractor's representatives must annually make a series of certifications regarding their compliance with the FAR and DFARs. They must also certify their status and compliance with SBA regulations.

82.     The Dawson Group Defendants, their officers and employees have abused their SBA 8(a) status and conspired to circumvent the rules established for SBA 8(a) qualified entities and filed false, material statements with the United States to be awarded contracts yet certified their SBA status when annually renewing their status to receive CAGE codes.

83.     Certain employees of the Dawson Group Defendants resigned from their positions when compelled by their employer to make false statements and representations to the United States in the annual certifications made to receive CAGE codes utilized for bidding on federal contracts.

**iii.     The Dawson Group Defendants conspired to violate the FCA and have repeatedly violated the FCA ny making false and fraudulent certifications to be awarded classified contracts and have allowed access to International Traffic in Arms Regulations (ITAR) and Export Administration Regulations (EAR) controlled information to foreign nationals in violation of United States laws and their contractual certifications**

84.     The Federal Acquisition Regulation (FAR) defines a "Classified Contract" as "Any contract that requires, or will require, access to classified information (Confidential, Secret, or Top Secret) by the contractor or its employees in the performance of the contract. A contract may be a classified contract even though the contract document itself is not classified." All "Classified Contracts" must have,

at a minimum, the Clause 52.204-2, Security Requirements, incorporated into the contract. This clause binds the contractor to meet the security requirements identified in the National Industrial Security Program Manual (NISPOM).

85.     The FAR says federal entities "shall" use a DD Form 254 (Contract Security Classification Specifications) for classified contracts. This form must be part of the contract package and is used to identify other security requirements are imposed on a contractor. The DD 254 informs the contractor of the level of information they will be required to access, the level of security clearance the contractors will need, and how they will process, store, transmit, and destroy the classified information when the contract is complete. If the contractor then subcontracts the work, they are obligated, under the National Industrial Security Program, to pass those requirements on to the subcontractor.

86.     Contracts requiring work that is unclassified but sensitive should also be evaluated to ensure that contractors have undergone an appropriate level of background investigation to perform the required duties, and contractors must be made aware of any procedures or requirements regarding proper protection of unclassified but sensitive information.

87.     Because of his security clearance and background in intelligence, the Relator was hired by the Dawson Group Defendants to help secure contracts with federal intelligence agencies such as the Central Intelligence Agency (CIA), the Defense Intelligence Agency (DIA), the National Security Agency (NSA), the United States Department of Defense, and the Federal Bureau of Investigations (FBI).   By

the time he resigned, Relator had secured contracts valued at $40.5 million annually and $106, 435,112 over the life of the contract. See Exhibit A.

88.     Of the 23 contracts Relator had a role in securing, seven (7) had a security clearance of Top Secret; 11 had a security clearance of Secret; one (1) was Confidential and three (3) were unclassified.   See Exhibit A.

89.     The Dawson Group Defendants certify on each one of their "cleared" or U.S. contracts that there is no Foreign Ownership or Controlling Interests.   The Controlling Interests specifically addresses management and leadership of the company.

90.     Shail Jondhale, the Dawson Group Defendants Director of Accounting, is not a U.S. citizen. He is a citizen of India. Johndale sees every contract awarded to the Dawson Group Defendants including classified information He is identified as the POC for every Dawson company registration in www.SAM.gov. The System for Award Management is a government run site for contractor registration.

91.     Lyon (a/k/a Leon) De Souza, the Dawson Group Defendants Director for Strategic Planning is not a U.S. citizen. He is a dual Canadian and South African citizen. He is the point of contact for Dawson Federal. DeSouza lives in San Diego. He has a Department of Defense Common Access Card (CAC) to access military installations and government facilities in San Diego including the Navy Base, the Naval Air Station and the SPAWAR facilities. He also used his CAC to enter the U.S Army Corps of Engineers facility in Los Angeles, CA.

92.     The HNC is governed by a three (3) member Board of Directors (BOD). Christopher Dawson is the Chairman of the BOD and Chief Executive Officer over all of the Dawson Group Defendant companies. He is a native Hawaiian and has the appropriate security clearances. Beatrice Dawson is a member of the HNC BOD and is a U.S. citizen but does not have a security clearance. Donne Dawson is the third member of the BOD and a Hawaiian native but also a Canadian citizen.  Neither Beatrice nor Donne Dawson are eligible to manage of any of the Dawson "cleared" companies which include Dawson Technical, Dawson Federal, Dawson Enterprises, Dawson Solutions and D7, which is essentially all of the Dawson Group Defendants. Christopher Dawson was the only eligible native Hawaiian to run the companies under the SBA program and he was never involved with any of the cleared companies or contracts. Billy Cress, the President of all of the Dawson Group Defendants has a TOP SECRET clearance and was the Key Management Person for all of the cleared contracts and cleared companies as submitted by the Dawson Group Defendants to the Defense Security Service per the NISPOM.

93.     Despite Relators best efforts, the Dawson Group Defendants did not have the appropriate safeguards in place to be awarded classified contracts and protect classified material.

**iv.     The Dawson Group Defendants Conspired to violate the FCA and repeatedly violated the FCA By Making, Using and Presenting Materially False Claims and Records to the United States to be awarded contracts by the United States and receive payments from the United States**

94.     Each time the Dawson Group Defendants bid on and or were awarded a federal contract, they made representations and certifications that they were compliant with SBA 8(a) Program regulations, the FAR and the DFAR. (See contract list --Exhibit A).

95.     The Dawson Group Defendants were awarded the contracts listed in Exhibit A, and many others, based on their false and fraudulent representations and certifications.

96.     The false and fraudulent representations and certifications made to the United States in connection with these contracts listed in Exhibit A were material. Had the government known the truth, the contracts would not have been awarded, nor payments made by the United States.

97.     A majority of the contracts awarded to the Dawson Group Defendants came from the Department of Defense (DoD). The Dawson Group Defendants submitted invoices or DD250s to the Department of Defense in the Wide Area Workflow (WAWF) computer-based system. Effective July 2018 that system became iRAPT – Invoicing, Receipt, Acceptance and Property Transfer. WAWF and iRAPT enable electronic form submission of invoices, government inspection, and acceptance documents. Once those invoiced were processed, the Defense Financial Accounting System (DFAS) made payments to the Dawson Group Defendants on behalf of the United States the Department of Defense on the contracts listed in Exhibit A, and many others.

98.     As with DoD contracts, the Dawson Group Defendants submitted false and fraudulent invoices for payment to all of the United States entities after being awarded those contracts.

99.     The Dawson Group Defendants acted, at a minimum, with reckless disregard or deliberate ignorance with respect to the truthfulness of its claims for payment and the records underlying those claims.

100.    The other corporate Defendants, and the officers and employees acted with actual knowledge, reckless disregard, or deliberate ignorance when they created false invoices and made other false records and statements to get false or fraudulent claims paid by the United States or caused the Dawson Group Defendants to submit false claims to the United States.

## B. COST MISCHARGING

**i.      Dawson Group Defendants fraudulently transferred money and assets to companies owned by Dawson Group Defendant's officers and employees and/or paid them for "phantom" services that were not performed**

101.    The Government's acquisition of goods and services is governed by the Federal Acquisition Regulation (FAR) (codified at Title 48 of the Code of Federal Regulations), the applicable provisions of which, including the FAR's cost principles, were incorporated into federal contracts.

102.    Under the FAR and the contracts awarded Dawson Group Defendants, they were entitled to reimbursement for its allowable costs.  To be allowable, a cost

must be incurred, reasonable, allocable to the contract, and not otherwise unallowable under applicable statutes and regulations.  FAR 31.201-2.

103.   A cost is reasonable "if . . . it does not exceed that which would be incurred by a prudent person in the conduct of competitive business."  FAR 31.201-3. Reasonableness depends on a "variety of considerations and circumstances," but generally includes the contractor's: (a) adherence to sound business practices; (b) commitment to arm's length bargaining; (c) attention to its responsibilities to the Government; and (d) adherence to its own established practices.  Id.

104.   Under the FAR, the Dawson Group Defendants had a duty, when awarding subcontracts for work, to "[c]onduct appropriate cost or price reasonableness analyses to establish the reasonableness of proposed subcontract prices."  FAR 15.404-3(b)(1).

105.   The two preferred methods for ensuring the reasonableness of subcontract prices are adequate price competition and comparison of the price with previous prices for the same or similar items.  FAR 14.404-1(b)(2)(i) and (ii), and (b)(3).  In fact, the FAR requires the award of subcontracts on a competitive basis "to the maximum practical extent."  FAR 52.244-5.

106.   In a firm fixed price contract (FFP) the government pays an agreed-upon, set price for goods and services regardless of what it costs the contractor to provide. The government agency overseeing the contract is not required to pay for any inefficiencies or delays on the part of the contractor. The FFP contract encourages a contractor to be efficient in its operations in order to make a profit. If

the contractor provides the good or service for less than the agreed-upon price, the difference is profit. Conversely, if the government contractor has unnecessary delays or expenses that cause their costs to go over the agreed-upon price, the contractor will bear the loss.

107.   In a time and materials (T&M) contract, the government contractor is reimbursed by the government for the time spent and materials used to produce a good or service. As opposed to a FFP contract, the price of a good or service cannot usually be estimated at the time the contract is agreed to. As the government contractor incurs additional costs in executing the contract, they are entitled to reimbursement by the government.

108.   The Dawson Group Defendants purposely charged costs that were not allowed by the contracts misclassifying them as allowable costs. Dawson Group Defendants annually procure season tickets to Dallas Cowboy football games and parking passes which are only provided to Dawson Group Defendant officers and are not part of an employee recognition program. These costs are "charged" as Other Direct Costs to various projects.  They also procure season court side tickets to San Antonio Spurs basketball games for officers and are not part of an employee recognition program. These costs are  also "charged" as Other Direct Costs to various projects.

109.   The Dawson Group Defendants engaged in a cost mischarging scheme where they intentionally shifted costed and expenses between different contracts. Starting in 2016, Dawson Group Defendants began a program called "Inter Company

Transfers" moving funds from one Dawson Group Defendant company to another unrelated to the actual contract or direct costs. In 2016, Dawson Technical, LLC graduated from the 8(a) program. The "Inter Company Transfers" were a means to move funds from active 8(a) companies to Dawson Technical in efforts to circumvent the 8(a) excessive withdrawal provisions. These transfers were structured to be payments on unspecific subcontracts between Dawson Technical and the Dawson Group Defendant company actively participating in the 8(a) program.

110.   As an example of this fraudulent cost mischarging, in October of 2013, Defendant Dawson Federal was awarded a contract for Grounds Maintenance and snow removal at the Air Force Academy in Colorado Springs, CO, Contract # FA7000- 14-D-0001 valued at $2,098,532 a year. Dawson Federal has been awarded this contract each year through October 30, 2018.

111.   Dawson Federal purchased the equipment needed to perform this contract such as lawn mowers, snow blowers, trucks, etc. from the previous contractor that had been awarded this contract.

112.   From November 2013 through October 2018, Defendant Wagon Wheel, which was owned and operating by officers and employees of Dawson Group Defendants, invoiced Dawson Federal for $7,000 per month to lease the equipment already owned by Dawson Federal. This is a Time and Materials contract, so the Wagon Wheel invoices were used to create Dawson Federal's fraudulent monthly invoice to the Air Force.

113.   The Dawson Group Defendants also fraudulently invoiced the United States for "phantom" or non-existent good and services. As an example of this fraudulent phantom cost mischarging, on December 5, 2016, the Air Force awarded Dawson Enterprises LLC a $21,357,584 FFP contract FA2823-17-C-4010 for construction of modular buildings at Eglin Air Force Base, Florida, to be complete by Aug. 31, 2017. This award was the result of a sole-source acquisition received by virtue of the companies 8(a) status.

114.   Dawson Enterprises subcontracted with Defendant BD Solutions for consulting work on the Air Force contract FA2823-17-C-4010.  Bobby Miller and Dwayne Sellers are principal officers for Defendant BD Solutions and active Dawson Group Defendant employees. Neither are native Hawaiians.

115.   Bobby Miller and Elodia Miller are the principal officers of Defendant Program and Construction Management, LLC and Dawson Group Defendant employees. Jeff Bleke, Wes Lane and Billy Cress are principle owners of Defendant Program and Construction Management and Billy Cress was the President of the Dawson Group Defendants; Wes Lane is a General Manager and Officer of Dawson Group Defendants; and, Jeff Bleke is an employee of Dawson Group Defendants. None are native Hawaiians.

116.   After the award of the Air Force contract FA2823-17-C-4010, Billy Cress directed Elodia Miller to have Program and Construction Management to invoice Dawson Enterprises $100,000 for undisclosed "phantom" work.  She complied. As noted in paragraph 79 above, in January 2017, Program and

Construction Management was paid $100,000. Billy Cress then directed Elodia Miller to provide him a check for $100,000.

> **ii.    Officers and employees of the Dawson Group Defendants own companies that fraudulently invoice Dawson Group companies for work performed as vendors or subcontractors to circumvent the SBA 8(a) Program regulations, Federal Acquisition Regulations (FAR), and Defense Federal Acquisition Regulations (DFAR).**

117.    An example of false invoicing and cost mischarging by officers and employees of the Dawson Group Defendants that own companies that fraudulently invoice Dawson Group companies for work performed as vendors or subcontractors also involved Air Force Contract FA2823-17-C-4010. Defendant Sandlot Ventures, is a company owned and operated by officers and employees of Dawson Group Defendants, Jeffrey Bleke, Wes Lane, and Billy Cress. Sandlot purchased furniture using Dawson Group Defendant funds for just over $200K. Sandlot Ventures then added $100K for shipping and handling and invoiced Dawson Group Defendants. The Dawson Group Defendants used that invoice to bill the Air Force $306K on contract FA2823-17-C-4010.

118.    Another example of false invoicing and cost mischarging by officers and employees of the Dawson Group Defendants that own companies that invoice Dawson Group companies for work performed as vendors or subcontractors involved Defendant Total Reliant Consulting (TRC). TRC is owned by Frank Gilbert, Ronald Dryburgh and Dwayne Sellers. Mr. Sellers is an officer and employee of Dawson Group Defendants.

119.   In June 2015, Dawson Federal was awarded the Nuclear Munitions Command and Control (NMC2) Data Management Services (DMS) contract FA9401-15-C-0006 at Kirtland Air Force Base in Albuquerque, New Mexico for $698,793.16 per year.  Dwayne Sellers salary was paid by Dawson Federal for his work on the NMC2 contract. Mr. Sellers is also a principle owner of TRC and received proceeds from that contract. That contract is the only source of revenue for TRC.

120.   In 2015, Mr. Gilbert and Mr. Dryburgh were full-time employees of Booz Allen Hamilton (BAH). They were able to convince the Air Force to separate their small effort from the larger BAH contract which the Air Force did. That effort was developed into the NMC2 contract that was a directed, sole source award to Dawson Group Defendants.  TRC was subsequently created and provided the subcontract by Dwayne Sellers who was the Director of Contracts for the Dawson Group Defendants. Mr. Gilbert, Dryburgh and Sellers are the principle owners of TRC. All three (3) were Dawson Group Defendant employees and none were native Hawaiians.  When Dawson Group Defendants received the contract, TRC was able to bill work done by Dawson Group Defendants on the contract as work performed by the subcontractor, TRC.

### iii.   Unexplained $500,000 Disbursement to Wagon Wheel, a Defunct Company

121.   In June 2018, Dawson Federal, an SBA 8(a) company dispersed exactly $500,000 in an undisclosed transaction to Wagon Wheel.

122.   Relator saw this unexplained disbursement in June 2018, Dawson Group Defendants held a program managers training titled, "PM 101". The instructors provided detailed training on JAMIS the Enterprise Resource Planning and DCAA compliant software the companies use. One of the functions discussed was Accounts Payable.  The instructor put up a spreadsheet on the screen which displayed all of the Accounts Payable which included a $500,000 payment to Wagon Wheel, a defunct company. In 2013, Wagon Wheel (a Texas Company) voluntarily discontinued operations.

123.   Wagon Wheel was a venture started by Chris Dawson, the CEO of the Dawson Group Defendants, Billy Cress, the President of the Dawson Group Defendants, and Bryan Hara, the Hawaiian Native Corporation Treasurer and former Chief Financial Officer for the Dawson Group Defendants. Both Chris Dawson and Bryan Hara reside in Hawaii and do not routinely travel to San Antonio, Texas. Their most recent trip was in 2016.

124.   In 2013, Wagon Wheel voluntarily discontinued operations. Relator understands Billy Cress has access to and control over the Wagon Wheel bank account located in Texas. Relator believes the payment was shown inadvertently as the even number and a payment to a defunct company owned by Dawson Group Defendant insiders is a red flag for an illegal disbursement.

**iv.     Time Card Fraud/Labor Mischarging**

125.   During the November 2017 Annual Meeting of the Dawson Group Defendants, Chris Dawson, Chairman of the Board and Chief Executive Officer of

the Dawson Group Defendants, along with his sister Lani Dawson, Chief Advocate, Native Hawaiian Corporation, discussed cash flow issues the company was facing.

126.   The next month, in early December 2017, Mike Patterson, the General Manager of the Dawson Group Defendants sent an email to overhead employees directing them to charge their overhead time to a rotating series of charge codes to select Dawson Group Defendant projects in an attempt to lower Overhead costs. Most of the project managers complained because they did not want those overhead charges on their projects.

127.   Relator confronted Mike Patterson about the issue since two of his employees McNally and Ferguson had those charges on time cards that Relator rejected. Relator was removed as time card approver and time cards were then were approved by Patterson.

128.   Another example time card fraud and labor mischarging involved Air Force Contract FA2823-17-C-4010 discussed above.  The salaries of Bobby and Elodia Miller were invoiced monthly to the contract. Bobby and Elodia Miller are married. Bobby Miller was the site superintendent and Elodia Miller was the purchasing agent for all supplies and materials for the project.  Their time was also charged to the program twice.  Once as employees of Defendant Program and Construction Management, but masked as "Labor" on their invoice to Dawson Group Defendants and once as Dawson Group Defendant employees working on the contract. The United States was billed twice for their labor.

## COUNT I
### Conspiracy to Violate the False Claims Act
### 31 U.S.C. § 3729(a)(l)(C)

129.   Relator repeats and realleges paragraphs 1 through 128 above as if fully set forth herein.

130.   Beginning at least as early as 2014 and continuing through the date of this Complaint, the Defendants willfully conspired to:

  a. knowingly present, or cause to be presented, false or fraudulent claims for payment or approval by the United States;

  b. knowingly make, use, or cause to be made or used, false records or statements material to false or fraudulent claims; and

  c. knowingly make, use, or cause to be made or used, false records or statements material to an obligation to pay or transmit money to the United States all in violation of 31 U.S.C. § 3729(a)(l).

131.   One or more of Defendants performed various overt acts in furtherance the conspiracy, including but not limited to the following:

 a. Making, using and presenting materially false and fraudulent certifications to the United States;

 b. Falsely and fraudulently acquiring certification as a SBA 8(a) small and disadvantaged business and NHO;

 c. Falsely and fraudulently acquiring CAGE Codes from the Government Services Administration (GSA) for use in bidding on federal contracts;

- 39 -

d.  Falsely and fraudulently making certifications to be awarded contracts by the United States;

e.  Falsely and fraudulently making representations to be awarded contracts which allowed access to International Traffic in Arms Regulations (ITAR) and Export Administration Regulations (EAR) controlled information to foreign nationals in violation of United States laws and their contractual certifications.

f.  Making, using and presenting materially false and fraudulent records and claims to the United States for payment;

g.  Invoicing for work performed as vendors or subcontractors to circumvent the SBA 8(a) Program regulations, Federal Acquisition Regulations (FAR), and Defense Federal Acquisition Regulations (DFAR);

h.  Engaging in cost and labor mischarging and time card fraud by improperly charging time and material expenses to the United States under various contracts to circumvent the FAR, DFAR and SBA 8(a) regulations; and

i.  Creating false invoices to pay for "phantom" services that were not performed.

132.   All of these false statements, claims and certifications were material in that, had the government known the truth, the contracts would not have been awarded, nor payment made on these contracts.

## COUNT II
### False Claims Act
### 31 U.S.C. § 3729(a)(l)(A)
### Presentation of False or Fraudulent Claims

133.   Relator repeats and realleges paragraphs 1 through 128 above as if fully set forth herein.

134.   Defendants knowingly presented, or caused or conspired to be presented, false or fraudulent claims for payment or approval.

135.   By virtue of the false or fraudulent claims knowingly made or caused to be made by Defendants, the United States suffered damages and therefore is entitled to recover its damages, treble damages under the False Claims Act, and a civil penalty for each violation thereof.

## COUNT III
### False Claims Act
### 31 U.S.C. § 3729(a)(l)(B)
### Making or Using False Records or Statements
### Material to False or Fraudulent Claims

136.   Relator repeats and realleges paragraphs 1 through 128 above as if fully set forth herein.

137.   Defendants knowingly made, used, or caused or conspired to be made or used, a false record or statement material to a false or fraudulent claim;

138.   By virtue of the false records or false statements knowingly made or caused to be made by Defendants, the United States suffered damages and therefore

is entitled to recover its damages, treble damages under the False Claims Act, and a civil penalty for each violation thereof.

**PRAYER FOR RELIEF**

WHEREFORE, Relator requests that judgment be entered in favor of the United States and against Defendants jointly and severally as follows:

1.      For an award of damages in the amount of at least $106,435,112.67 reflecting the minimum value of the contracts obtained by Defendants' improper conduct;

2.      For an award of treble damages under the False Claims Act in the amount of at least $319,305,338 million;

3.      For civil penalties reflecting the maximum penalty available under the False Claims Act ($11,000) for each false statement or claim;

4.      For injunctive relief;

5.      For an award to Relator in the maximum amount permitted under 31 U.S.C. § 3730(d) or any other applicable law, including alternate remedy provisions;

6.      For an award to Relator of court costs, litigation expenses, and reasonable attorney's fees; and

1    For all such further relief as may be just and proper.

2    Plaintiff demands a jury trial.

3

4

5  Dated: December 19, 2018

6

7

8

9    Robert E. Connolly (CA bar# 320382)
     bob@reconnollylaw.com
10   Law Office of Robert E. Connolly
     301 N. Palm Canyon Drive
11   Suite 103; #241
     Palm Springs, California 92262
12   (215) 219-4418
     Counsel for Relator Eugene Sellers

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| Name | Contract | Status | Client | Clearance Level | DAWSON Project Number | Company | CAGE Code | Annual Value | POP | Cleared Employees | Total Contract Value |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Air Information Operations Center | Camp Shelby, MS W9127Q-16-P-0128 | Open | Camp Shelby, ARNG | SECRET | 10242 | DAWSON Federal | 6UTH1 | $ 676,724.90 | 3 | 7 | $ 2,030,174.70 |
| CENTRIXS Network Operation and Maintenance | Centrix (W912CN-14-C-0024) Contracts ends Mar 17 | Closed | Army | SECRET | 20048 | DAWSON Technical | | $ 69,408.52 | 3 | 4 | $ 208,225.56 |
| CI Functional Support Services | DIA CCO-4 (HHM402-16-C-0072) | Open | DIA | TOP SECRET | 10231 | DAWSON Federal | 6UTH1 | $ 1,126,520.10 | 5 | 5 | $ 9,821,440.21 |
| USAICoE G3 and Quality Assurance Office | G-3 (W91RUS-16-C-0049) | Open | INSCOM | TOP SECRET | 10243 | DAWSON Solutions | 57JH5 | $ 494,611.20 | 5 | 2 | $ 2,493,333.96 |
| ARNG Installation Notification and Warning System (INWS) Support Contract | INWS (W912DY-16-C-0040) | Open | ARNG | SECRET | 10245 | DAWSON Solutions | 57JH5 | $ 2,989,197.99 | 3 | 24 | $ 8,967,593.97 |
| Knowledge Based Services | KBS - Ft , Arizona W900KK-17-C-0020 | Open | INSCOM | TOP SECRET | 10292 | DAWSON-ISC Group, LLC | 7L5D1 | $ 6,089,264.31 | 3 | 25 | $ 18,267,792.93 |
| Naval Computer and Telecommunications Area Master Station Pacific (NCTAMS PAC) | NCTAMS PAC N00604-16-F-3004 BAE is the Prime | Open | BAE | SECRET | 3031003.003 | DAWSON Federal | 6UTH1 | $ 433,254.10 | 2 | 14 | $ 866,508.20 |
| Nuclear Munitions Command and Control (NMC2) Data Management Services | NMC2 (FA9401-15-C-0006) | Open | AFNWSC | SECRET | 10106 | DAWSON Federal | 6UTH1 | $ 698,793.16 | 5 | 2 | $ 3,493,965.80 |
| Replace EHW 1 & 2 Bull Rail Receptacles | NSB Kings Bay (N69450-16-D-1116) | Open | NAVFAC | Confidential | | DAWSON Federal | 6UTH1 | $ 161,000.00 | 1 | 9 | $ 161,000.00 |
| System Security Engineering Services | SSES (FA7037-15-C-0003) | Open | 25AF | TOP SECRET | 10046 | DAWSON Innove Solutions | 6UGM7 | $ 5,187,084.00 | 3 | 12 | $ 15,561,252.00 |
| FBI Onsite Piping and Plumbing Inspection Services (IDIQ) | DJF-16-1200-V-0005131 | Open | FBI | Unclassified | 10247 | DAWSON Federal | 6UTH1 | $ - | 0 | 0 | $ - |
| FBI Physical Security Upgrades -- Martinez, CA | DJF-16-1200-D-0003284 | Open | FBI | Unclassified | 10247 | DAWSON Federal | 6UTH1 | $ 219,000.00 | 1 | 0 | $ 219,000.00 |
| Modernize Enterprise Terminals | W15P7T-09-D-H001 | Open | Army | SECRET | 10029 | DAWSON Federal | 37SH3 | $ 376,811.93 | 1 | 6 | $ 376,811.93 |
| FBI Piping and Plumbing Assessment (Task Order) | DJF-16-1200-D-0001597 | Open | FBI | Unclassified | 10214 | DAWSON Federal | 6UTH1 | $ 100,000.00 | 1 | 0 | $ 100,000.00 |



EXHIBIT
A

| Cyber Assurance | FA9401-15-R-0009 | Closed | AFNWC | SECRET | 10134 | DAWSON Federal | 6UTH1 | $ 1,187,527.00 | 1 | 3 | $ 1,187,527.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Facilities Operations | HSFE20-15-C-0172 | Open | DHS | U.S. ONLY | 10280 | Aktarius | 5UV89 | $ 11,319,256.77 | 1 | | $ 11,319,256.77 |
| USAES Counter Explosive Hazard Center Instructors | W911S7-16-C-0025 | Open | Army | SECRET | 10281 | Aktarius | 5UV89 | $ 486,684.00 | 1 | | $ 486,684.00 |
| CBRN Defense Doctrine, Training, Leadership & Education Support | N00178-12-D-7062 | Open | Navy | TOP SECRET | 10282 | Aktarius | 5UV89 | $ 621,058.00 | 4 | 4 | $ 2,484,232.00 |
| Archer Fury | W91249-17-P-0130 | Closed | Army | SECRET | 10315 | DAWSON Federal | 6UTH1 | $99,995.80 | 1 | 5 | 99,995.80 |
| Advanced Expeditionary Warfare Development (AEWD) | W911NF-15-D-0013 | Open | ARL | TOP SECRET | n/a | Aktarius | 5UV89 | | 2 | | $ - |
| National Background Investigations Systems / Deputy Director Mission Expansion | HC1047-17-C-4009 | Open | DISA | SECRET | 10168 | DAWSON Solutions | 57JH5 | $1,823,055.60 | 1 | 6 | $ 1,823,055.60 |
| Military Health Enterprise Strategic Integration and Engineering Support | HT0011-17-R-0027 | Open | DHA | SECRET | 10369 | DAWSON Solutions | 57JH5 | $4,027,553.54 | 5 | 13 | $21,370,463.19 |
| G-6 IT Support Services | W91249-17-R-0123 | Open | Ft Gordon | TOP SECRET | 10379 | DAWSON Solutions | 57JH5 | $ 2,352,870.61 | 1.5 | 29 | $ 5,096,799.05 |
| | | | | | | | | | | | $ - |
| | | | | | | | | | | | $ - |
| Total | | | | | | | | $ 40,539,671.53 | 54 | 170 | $ 106,435,112.67 |